# GILBERT

*vs.*

## THE WASHINGTON BENEFICIAL ENDOWMENT ASSOCIATION.

---

APPELLATE PRACTICE; APPEAL, DISMISSAL OF; FINAL DECREES; EQUITY PLEADING AND PRACTICE; INTERVENING PARTIES; RECEIVERS; CONSOLIDATION OF CAUSES; AUDITOR, ACCOUNTING BEFORE; FRAUDULENT CONVEYANCES; CORPORATIONS, CAPITAL STOCK IN; TRUSTS; CREDITORS; CONTRACTS, RESCISSION OF.

1. Where a petition to intervene is filed in an equity cause and an order passed making the petitioner a party, but no service of process is had upon any of the parties, a motion made by the

petitioner in this court to dismiss an appeal taken from a final decree in the cause by one of the original parties, will not be considered.

2. Where the sole issue between two of the parties to a suit is the question of the validity of a deed from one of the parties to the other, upon the determination of which question the method of the distribution of a fund in court depends, and a decree is passed which vacates and annuls the deed and refers the cause to the auditor to state an account and make a report upon the claims of the original and intervening parties, the decree is such a final decree as to be appealable by the party whose deed is vacated and annulled by it, and whose right to the fund is so affected.

3. The receiver of a corporation intervening in a suit in equity brought against his company before his appointment, should answer or demur to the bill of complaint in the name of the company and not in his own name.

4. Where various irregularities of pleading appear in a number of equity suits which have been consolidated in the lower court, but it appears from the record on appeal that one of the suits in which the pleadings are regular and satisfactory has been treated by all parties concerned as the principal suit and the others as only ancillary to it, it will be assumed on the appeal that the parties waived the various irregularities of pleading; but on the final hearing each party must stand or fall by the record in his own case.

5. While consolidation of causes, especially in equity, is always proper whenever the conditions justify it, the exercise of the power to consolidate should be carefully guarded, as it is frequently apt to lead to greater inconveniences than it prevents.

6. At law consolidation ought not generally to be granted until after issue joined, but in equity whenever the subject-matter is the same although the parties may differ, consolidation may be allowed at any time, even though the defences may be entirely different.

7. Whenever consolidation is consented to by all parties their implied agreement is that the several actions shall be discontinued and a new and distinct action shall be created, in which shall be included and litigated all of the questions presented by the pleadings in the former actions.

8. Where a decree passed in a series of equity suits which have been consolidated and in which has been litigated the validity of a sale by one insurance company to another of all of its property, and the claims of various original and intervening parties, many of whom are certificate holders in one of the companies, to a fund realized from such sale, sets aside the sale and refers the causes to the auditor to state an account and report upon

the various claims, not only those certificate holders who have filed bills of complaint. or formally intervened by petition, but all similar certificate holders may present their claims to the auditor and have them adjudicated.

9. In such a series of suits so consolidated, where the principal suit is the one filed by the complainant company against the defendant company to vacate as fraudulently obtained a deed of its property franchises and effects, while the other suits and intervening petitions are by certificate holders in the complainant company, and the testimony shows that with the proceeds of the sale the defendant company was to acquire all of the shares of stock of the other, and so become the sole stockholder and owner, a decree which vacates the sale as fraudulent may also properly direct that the proceeds of the sale be held for the payment of the claims of the certificate holders. By the consolidation of the causes and the intervention of the certificate holders who have been made parties complainant, the proceeding virtually becomes one by creditors and certificate holders to reach the assets of an insolvent corporation.

10. The capital stock of a corporation constitutes a trust fund to which creditors of the corporation may rightfully look for the satisfaction of their claims, and which cannot be withdrawn without their consent; but the corporation may dispose of its stock, or any property into which such stock has been converted, in good faith to creditors in discharge of its debts, or may sell it to *bona fide* purchasers for a valuable consideration.

11. Where throughout an entire transaction which resulted in the sale by one corporation of its entire property and franchises to the other, the presidents of the two corporations, in person or by agent, represented their companies, the good faith of the corporations is to be determined by the good faith and knowledge of their presidents.

12. The sale by one insurance company of its entire property worth $40,000 to another for $14,000, upon condition that the second company would reinsure the certificate holders of the first company if they would accept its terms, and assume accrued liabilities of the selling company amounting to about $26,000, held to be void as against the creditors of certificate holders in the latter company for fraud and want of consideration, under circumstances showing that shortly after the sale the purchasing company had become insolvent.

13. Whether such payment of $14,000 in such a transaction was made for the purchase of all the stock of the vendor corporation so as thereby to enable the vendee corporation to become the sole stockholder of the other, and as such entitled to all its assets, or whether the payment was actually made on account

of the property, the purchasing company cannot set-off the amount so paid against the claims of creditors and certificate holders of the other company to the proceeds of the sale or insist upon its repayment as a condition of the rescission of the contract. It would only be entitled to the residue, if any, after payment of the claims of such creditors and certificate holders.

No. 629. Submitted February 10, 1897. Decided March 1, 1897.

HEARING on an appeal by one of several defendants from a decree passed on the hearing of four suits in equity, consolidated by the court below, to reach assets of an insolvent corporation. *Affirmed.*

The COURT in its opinion stated the case as follows:

Four suits in equity, the general purpose of all of which was to reach certain assets of the Washington Beneficial Endowment Association which had gone into the hands of the Commercial Life Insurance Company, for the purpose of subjecting such assets to the payment of the claims of various parties to the suits, were consolidated, or are assumed to have been consolidated, in the Supreme Court of the District of Columbia, where they had been instituted; and the present appeal has been taken from one decree rendered in each and all of them.

The Washington Beneficial Endowment Association is, or was, a body corporate, organized under the general incorporation act of Congress enacted for the District of Columbia, for the purpose, as stated in its certificate of incorporation, " of providing an endowment fund to be paid to the persons entitled thereto upon the death of the party named in the certificate of endowment." It was also stated in the certificate that the capital stock of·the association should be $10,000, divided into 200 shares of $50 each. This was afterwards increased to $20,000, divided into 400 shares of $50 each. But notwithstanding that it was apparently a joint stock organization, the association was intended to be conducted mainly on the principle of mutual life insurance

associations, and its funds were to be mainly raised by assessments upon those who united themselves to the association by receiving certificates of insurance therefrom, the equivalent of the ordinary policies of insurance in other companies, which assessments were to be made from time to time on the death of any member by a call upon all the other members of the class to which the deceased member belonged—an alluring but insecure and defective scheme of life insurance.

. The association was organized in 1877, and soon afterwards adopted by-laws, one of which has been greatly relied upon in this case, and which is as follows:

"Art. 17, Section 1.   The capital stock, together with the reserve fund and surplus fund, shall be held at °all times liable for the security of the certificate holders."

The affairs of the association seem to have been sufficiently successful for sixteen or seventeen years; but in August, 1894, the holders of certificates of insurance issued by it were startled by the announcement of its virtual insolvency, and the transfer of all its assets to an organization in the city of New York, incorporated under the laws of the State of New York, and known as the Commercial Alliance Life Insurance Company, itself also a moribund concern, which soon afterwards went into the hands of a receiver, and was dissolved by a decree of the courts of the State of New York.

Certificate holders and creditors of the Washington association, deeming that their rights had been violated, instituted proceedings in equity in the Supreme Court of the District of Columbia, and the four suits here consolidated were filed in the course of a few months.

On August 30, 1894, about three weeks after the transfer by the Washington association to the New York company, Robert Ball, Hannibal D. Norton, and Solomon J. Fague, who each held certificates of insurance, or certificates of endowment, as they were called, from the Washington association, filed their bill in equity, designated in the record as

No. 15,809 on the docket of the Supreme Court of the District of Columbia, sitting in equity, against the two organizations, and Lawrence Gardner, president of the Washington association. After reference to facts hereinbefore stated, they alleged that the association had become insolvent and had ceased to do business; that the transfer to the New York company was fraudulent and in violation of their rights, and that out of the assets so transferred they were entitled to be paid the value of their several certificates, whatever such value should be ascertained to be, and the prayer of the bill was for an injunction, the appointment of a receiver, and the winding up of the business of the association.

Answers to this bill, substantially identical, were filed by the Washington association and by Gardner individually. In these answers they denied the insolvency of the association, which was afterwards conclusively proved, and alleged that it had ample assets in the power of assessment to meet all its liabilities, a statement which proved to be utterly illusory. They averred that the Commercial Alliance Life Insurance Company had, by purchase for the sum of $13,939, become the owner of all the outstanding stock of the association, amounting to 263 shares, being at the rate of $53 a share, and that an arrangement had been made between the Washington association and the Commercial Alliance Company, whereby the latter agreed in some manner to re-insure such certificate holders of the Washington association as would enter into their scheme and accept their terms. It seems not to have been known to the complainants at the time that all the property of the association had been actually transferred to the New York company; and consequently nothing was said about that transfer either in the bill or answers.

In the meantime there had been a second suit instituted, which was by the association itself against the New York company; and after the foregoing answers had been filed,

10 Ct. App.—22

there was an order made, on motion of counsel for the complainant, to consolidate this suit with that.

Subsequently the appellant, William T. Gilbert, the receiver appointed in New York for the Commercial Alliance Company, was by order of court permitted to intervene in the suit, and he filed a demurrer to the bill of complaint.

There seem to have been no further pleadings in the cause, no replication to the answers of the association and Gardner, and no action upon the demurrer of Gilbert.

On October 6, 1894, Gardner caused a bill in equity to be filed in the name of the Washington Endowment Association against the Commercial Alliance Life Insurance Company, to vacate, on the ground of fraud, the transfer which had been made on the 9th day of August, 1894, by the former to the latter, of all its assets, business, and good will; and it prayed for the cancellation of the deed of transfer, and for an injunction and the appointment of a receiver. This was sworn to by Gardner, and is numbered as 15,907.

On November 5, 1894, there was an appearance entered for the New York company, and on the next day, by consent of the respective solicitors, Andrew A. Lipscomb and Thomas M. Fields were appointed receivers to take charge of the assets mentioned in the bill, which consisted mainly of a piece of real estate in which the office of the association had been kept, and some personal property on the premises. These were afterwards sold by order of court and the consent of the parties, and the proceeds were brought into court by the receivers, and are held to await the result of the litigation.

Then, on December 1, 1894, followed the order, which has been already mentioned, consolidating this cause with the previous one. Subsequently there was an answer to the bill filed by the receiver of the New York company, the appellant here, in substance denying that there was any fraud in the transaction that had been had between the two companies. It does not appear that there was any replication

to this answer; but some months afterwards, in June and July, 1895, both parties proceeded to take testimony in the consolidated causes.

Two parties intervened by petition in this second cause— one in the early stages of the cause, a Mrs. Henry Ann Stuart, the beneficiary mentioned in a certain certificate of endowment issued by the association, and who, on October 1, 1894, after a protracted litigation, had finally obtained judgment against the association for the sum of $5,000, with interest from September ·29, 1887, the amount secured by the certificate—the second intervenor, one Carrie H. Golden, afterwards by marriage, or remarriage, Carrie H. Smith, who had, on December 19, 1894, obtained a judgment for $3,000, on a similar certificate of endowment.

Answers were filed to the petition of Mrs. Stuart both by the association and by the receiver of the New York company. Whether there was any replication to these does not appear; but testimony was taken in support of the petition about the same time as the taking of testimony in the main cause.

The petition of Carrie H. Golden was filed on December 10, 1895, after the testimony had been closed for several months, and the cause, or causes, stood ready for hearing. It is said that there was an order of court, making her a party; but the transcript of record before us does not show it. Nor does it appear that there was any service of process under it upon any one, or that there was any further proceeding of any kind upon the petition in the court below.

A third suit, designated as No. 16,072, Equity, was instituted on December 24, 1894, by James S. Edwards, as administrator of Anthony Buchly, deceased, against the Washington Beneficial Endowment Association, the Commercial Alliance Life Insurance Company, and Andrew A. Lipscomb and Thomas M. Fields, receivers, as defendants, for the same general purpose as the previous suits. It was based upon a liability which had accrued under a certifi-

cate of endowment, but which had not been reduced to judgment. This suit, on the motion of the complainant, was almost immediately ordered to be consolidated with No. 15,907, immediately preceding; and subsequently answers were filed to it by the receiver Gilbert, the appellant here, and by Lipscomb and Fields, also as receivers. No other proceedings so far as the record before us discloses, appear to have been had in the cause.

Lastly, on January 17, 1895, there was a fourth suit filed, designated as No. 16,165, Equity, which was a bill in equity by one Man S. Quarles, administrator of Alfred Shield, against the same defendants who are mentioned in the third suit, and upon the same or a similar basis of liability upon a certificate of endowment which had become due and payable in consequence of the death of the holder thereof. To this there was a demurrer interposed by the receivers Lipscomb and Fields, also a demurrer by the receiver Gilbert, and subsequently an answer by the Endowment Association. But it does not appear that there were any further proceedings in the case. It seems to be conceded that there was some order of court consolidating this suit also with the other suits, or with No. 15,907, although no such order appears in the record. It is recited, however, in the final decree of the court that it was so consolidated.

It appears that the suit of the Washington Beneficial Endowment Association against the Commercial Alliance Life Insurance Company, No. 15,907, Equity, for a rescission of the contract between them, was regarded as the principal suit in this litigation, and the others only as ancillary to it; and that for this reason they were all consolidated with it, and thereafter regarded and treated as part of that suit.

Testimony was taken in the consolidated suits, said to be for the complainants, the defendants, the respondents and intervenors, and also testimony in rebuttal; and the cause or causes ultimately came on for hearing, Thereupon there was a decree rendered on June 27, 1896, in which it was

adjudged that the deed of conveyance from the Washington Beneficial Endowment Association to the Commercial Alliance Life Insurance Company should be vacated and held void, and that the proceeds of sale in the hands of the receivers appointed in cause No. 15,907, should be held for the payment of the claims of the holders of the certificates of endowment issued by the association in such proportions as might afterwards be determined by the court upon the filing of a report by the auditor of the court. And reference was ordered to the auditor to state an account and to make a report to the court upon the claims already introduced by the holders of certificates, and upon any other similar claims that might be brought before him, and to state what sums severally they were entitled to receive.

From this decree the respondent, William T. Gilbert, receiver of the Commercial Alliance Life Insurance Company, was allowed an appeal in open court, and therein to sever from the other respondents, who all declined to join in the appeal or in its prosecution. And it is this appeal which is now before us.

*Mr. Thomas M. Fields* and *Mr. Henry D. Hotchkiss* for the appellant:

1. The so-called "trust fund" doctrine, on general principles of equity, if it ever had any real existence, is not now recognized. *Hollins* v. *Brierfield Coal and Iron Co.*, 150 U. S. 371; *Hospes* v. *Car Co.*, 48 Minn. 174; *Bank* v. *Potts*, 90 Mich. 345; *O'Bear* v. *Volfer*, 25 L. R. A. 707; *Meyer* v. *Chair Co.*, 32 S. W. 300; *Crites* v. *Hart*, 68 N. W. 362; *Childs* v. *Carlstein Co.*, 78 Fed. Rep. 86.

The by-law cannot be resorted to by creditors. It is not referred to in any policy. It was no concern of creditors nor did it affect their contracts with the association. *Flint* v. *Pierce*, 99 Mass. 68, 70; *Pritchard's Case*, 8 Ch. App. 956–960; *Ward* v. *Johnson*, 95 Ill. 215.

The "trust fund" doctrine has never been applied so as

to prevent an insolvent corporation from making a *bona fide* sale of its property. Insolvency does not *ipso facto* divest the legal title of the corporation to its property, and convert it into a "trust fund," inalienable by the legal owner. The "trust fund" doctrine is only applied to prevent an alienation in fraud of creditors, or an appropriation of assets by stockholders to the prejudice of creditors; and then only at the instance of proper parties and in appropriate legal proceedings. *Fogg* v. *Blair,* 133 U. S. 534. Its corporate powers remained intact. The $14,000 paid were corporate assets. If this and its other property were insufficient there was nothing to prevent the shareholders from furnishing new capital and then proceeding to use the corporate powers. *Coburn* v. *Papier Mache Co.,* 10 Gray, 245; *Kincaid* v. *Dwinelle,* 59 N. Y. 548; *Glass Manufactory* v. *Langdon,* 24 Pick. 52; *Taylor* v. *Insurance Co.,* 14 Allen, 353.

2. The by-laws of the association do not make its property a pledge or trust fund for its creditors. It is merely declaratory of the general principles of law and equity. This the court below admitted.

3. The association alone asked for rescission. It had received the company's $14,000, and under its contract with the company the company had incurred large obligations. He who seeks equity must do equity, and the association was bound to restore, or offer to restore, all the benefits which it had received from the company by the wholesale transaction, and the company was entitled to be put in *statu quo,* before rescission could be granted. Adams' Eq. No. 191; *Moore* v. *Ben. Assn.,* 43 N. E. Rep. 298; *Cunningham* v. *Railroad Co.,* 156 U. S. 400; *Thompson* v. *Peck,* 115 Ind. 512; *Barbour* v. *Morris,* 6 B. Mon. 120; *Jett* v. *Lock,* 5 J. J. Marsh. 591; Jones on Mortgages, Secs. 223, 224; *Thomas* v. *Railroad Co.,* 109 U. S. 522; *Frank* v. *Thomas,* 20 Ore. 265; *Tarkington* v. *Purvis,* 128 Ind. 182; *Moore* v. *Nicholson,* 6 Wall. 299.

The transfer did not virtually dissolve the corporation.

It still exists, and is treated in this and other causes as being undissolved.   By its charter it has perpetual existence, and it has never been dissolved by any of the proceedings known to law.   The mere distribution of certain of its assets to its stockholders, and ceasing to do business, did not dissolve it, nor dispense with the necessity of judgments at law.   *Swan* v. *Frank,* 148 U. S. 603.

The insolvency of the association did not render it powerless to sell its property.   Its managers had the right to sell to procure funds to pay its debts, if for no other purpose. The $14,000 and the obligation of the company to pay the $26,000 commissions on the business transferred, were merely substitutes for the property sold.

4. The premium notes were assets of the association.   So also were all unpaid assessments.   At least they were as good assets as the policies were liabilities.   Assessments could "only. be canceled by payment of the amount, and not by withdrawal or forfeiture."   *People* v. *Security Co.,* 78 N. Y. 114.

5. The transaction between the association and the company did not constitute a breach of the association's contracts with its members.   The association's members were not bound to transfer their insurance to the company, nor did the transaction render the association unable to carry out its contracts with them.   On the contrary, the object was to assist it in doing so.

The peculiar nature of the business conducted by the association must be noted.   It was not conducting a "regular life" or "old line" insurance business.   It needed no "reserve fund," nor did the members' premiums include any element of "reserve," so as to give their policies a "surrender value" (*e. g.,* see *Insurance Co.* v. *Statham,* 93 U. S. 30–31). The association levied and collected "assessments" after the plan of a co-operative company.   The association must be treated as a stock corporation conducting an ordinary trading business and issuing ordinary personal obligations.

·6. The contract between the association and company was made and intended to protect the association's policy holders and beneficiaries, and it made complete provision for their reinsurance, and the payment in full of all debts of the association. It was made in good faith, and the subsequent financial reverses of the company cannot operate to make it fraudulent. The contract could be enforced against and by the association. *Swan* v. *Frank, supra.*

7. The company was a *bona fide* purchaser for a valuable consideration, and the mere fact that it had notice of the obligations of the association, which both corporations intended to protect, does not deprive the company of the protection to which a *bona fide* purchaser for value is entitled. Nor would the fact that the association had obligations, whatever their extent, prevent it from selling or the company from buying its real estate.

The sale and transfer were *bona fide* and legal, and the creditors should be required to look to the stockholders for a refund of the money. To do this they or some of them should reduce their claims to judgment, and then all of the stockholders can properly be reached by one bill in equity, brought by one creditor in behalf of all, and separate suits against each one of them would not be proper. The authorities are clear on this point. 2 Thomp. Corp., Secs 1548, 1549, 1575.

8. The sale and transfer did not amount to a constructive fraud against the creditors of the association. Even if it did no relief could be granted them upon this ground, because their pleadings aver "trusts," "charges" and "liens," and not "fraud." *Very* v. *Levy,* 13 How. 345.

9. The creditors had no equitable lien or charge on the property and have none on the fund. *Dillon* v. *Barnard,* 21 Wall. 430; *Burke* v. *Childs,* 21 Wall. 441; *Wright* v. *Ellison,* 1 Wall. 555; *Christmas* v. *Gaines,* 14 Wall. 69; 13 Am. & Eng. Encyc. L. 608; *Woods* v. *Dickinson,* 7 Mackey,

301; *Porter* v. *White,* 127 U. S. 235; *Peugh* v. *Porter,* 112 U. S. 737.

There must be a distinct appropriation of the property and an agreement to pay from the specific fund, and all dominion over the property or fund must cease. No lien arises where from the nature of the contract between the parties it would be inconsistent with the express terms or clear intent of the contract. *Randel* v. *Brown,* 2 How. 406; *Wright* v. *Railroad Co.,* 117 U. S. 72.

*Mr. Andrew A. Lipscomb* for the appellee, The Washington Beneficial Endowment Association:

1. It was competent to show the real consideration for the deed, and that it had utterly failed. *Mills* v. *Allen,* 133 U. S. 719. The rule excluding parol proof does not apply to third parties. *Barreda* v. *Silsbee,* 21 How. 86; 1 Greenleaf Ev. 279.

2. The evidence clearly shows that the deed was procured by the false and fraudulent representations of the Alliance Company, and this alone was enough to annul the deed.

The company is not entitled to a return by the Beneficial Association of this $14,000 alleged to have been paid for the property, for the reason that this money was received by the stockholders, and not by the association, which received no consideration whatever. Where the fact of fraud is established in a suit at law the buyer loses the property without reference to the amount or application of what he has paid, and he can have no relief either at law or in equity. When the proceeding is in chancery the jurisdiction exercised is more flexible and tolerant. In some instances it visits the buyer with the same consequences which would have followed in an action at law. *Clements* v. *Nicholson,* 6 Wall. 787.

3. The by-laws of the association, brought to the knowledge of the Alliance Company, and its express promise, made the death claims liens on the property. But regardless of the by-laws of the association, and the express agreement of the

company, by the general principles of equity the property of the association was burdened with the payment of these death claims. *Angle* v. *Railroad Co.*, 151 U. S. 1; *Railroad Co.* v. *Pettus*, 113 U. S. 915; *Curran* v. *Arkansas*, 15 How. 304.

By its false representations as to its solvency, by its aiding the Beneficial Endowment to break its contracts with the policy-holders, by its unlawful manipulation of the stock of the Endowment Association, the Commercial Alliance became but a trustee *ex maleficio* of the property for the benefit of the Endowment Association's creditors. Pomeroy's Eq. Jur., Sec. 153; *Angle* v. *Railroad Co.*, 151 U. S. 1.

*Messrs. Padgett & Forrest* for the appellee Stuart:

1. The agreement of the Alliance Company that, as part of the consideration for the transfer of the property, it would pay the death claims then due by the Association, and that such claims should be a lien on the property, which should be held in trust for their payment, may be proved by parol. *Mills* v. *Allen*, 133 U. S. 423; *Hughes* v. *Edwards*, 9 Wheat. 488; *Clark* v. *Deshon*, 12 Cush. 589; *Clifford* v. *Turrill*, 9 Jur. 633; *Newhall* v. *Le Breton*, 119 U. S. 259; *Vellen* v. *Carmack*, 20 L. R. A. 101; *Raub* v. *Barbour*, 6 Mack. 245. Even if such parol contract could not be proved and enforced by the association against the company, it could be by the creditors seeking to enforce their rights. *Barreda* v. *Silsbee*, 21 How. 146; *Rawson* v. *Lyon*, 23 Fed. R. 107; *Horn* v. *Hausen*, 22 L. R. A. 617; *Butler* v. *Watkins*, 13 Wall. 456; *Durkin* v. *Cobleigh*, 17 L. R. A. 270; *Pugh* v. *Davis*, 96 U. S. 332.

The effect of such agreement was to bind the property with a trust for the payment of such claims. Jones on Liens, Secs. 82, 89; Jones on Mortgages, Sec. 192; *Hughes* v. *Edwards*, 9 Wheat. 488; Note to Law Ed., Book 6, p. 142. And the denial by the company of the existence of such agreement constitutes a breach of the contract. *Mills* v. *Allen*, 133 U. S. 423.

2. There are two other reasons why the company took the property subject to the liens of the death claims, and held it in trust for their satisfaction.  (1) The by-laws of the association provided that these claims should be a lien upon such property, and the company was informed of such by-laws and had notice of such lien prior to the transfer.   The sole object of the association was to provide an endowment fund to pay death claims, for which purpose the capital stock and reserve and surplus funds were at all times to be held liable for their payment, such payment to be made as they should become due and payable, *i. e.,* within sixty days after satisfactory proof of death.   These express declarations made by the association gave to these death claimants at least an equitable lien upon the capital stock and reserve and surplus funds of the association.

The testimony shows that the sole representative of the capital stock of the association was the real estate in question—in no other thing was the capital stock invested. "The capital stock and shares of capital stock are distinct things.   The capital stock is the money paid or authorized to be paid in as a basis of the business of the bank and the means of conducting its business.   It represents whatever it may be invested in.   It is a trust fund held by the corporation as a trustee.   Upon the dissolution of the institution, each shareholder is entitled to a proportionate share of the residuum after satisfying all liabilities.   The lien of all creditors are prior to his." *Farrington* v. *Tennessee,* 95 U. S. 686.   The Alliance Company, before and at the time of the conveyance, had notice of the existence of these by-laws, and that the death claims were an equitable lien upon the real estate.

The Alliance Company, by its actions in conjunction with Gardner, and because of the bad faith on the part of both, and of their violation of law and of their efforts to defraud the claimants, became a trustee *ex maleficio* of the death claimants in respect to the property.

3. A corporation in which the public is interested has no right to sell all its property and assets to another corporation unless expressly authorized by law. 6 Nat. Corp. Rep. 288; *Trans. Co.* v. *Pullman Co.*, 139 U. S. 50; *State* v. *Distilling Co.*, 46 N. W. 155; *Byrne* v. *Mfg. Co.*, 28 L. R. A. 304.

In case of the total abandonment of the business of a corporation, and the disposing of all of its assets, the only way sanctioned by law whereby that can be effected with justice to all parties is by a *bona fide* sale for cash or its equivalent. *Mason* v. *Pewabic Co.*, 133 U. S. 50; *People* v. *Ballard*, 17 L. R. A. 737; *Easun* v. *Brewing Co.*, 51 Fed. Rep. 156; Morawetz Private Corp., Secs. 30, 629, 667, 668. In the case of a corporation, as in the case of a natural person, any conveyance of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them. *Railroad Co.* v. *Ham*, 114 U. S. 587; *Washburn* v. *Green*, 133 U. S. 30; *Hollins* v. *Coal Co.*, 150 U. S. 371.

The capital stock and property of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust to be managed for the benefit of its shareholders during life, and for the benefit of its creditors in the event of its dissolution. The duty is a sacred one and cannot be disregarded. *Upton* v. *Tribilcock*, 91 U. S. 45; *Sawyer* v. *Upton*, 91 U. S. 50; *Scammon* v. *Kimball*, 92 U. S. 362; *Morgan Co.* v. *Allen*, 103 U. S. 498; *Railroad Co.* v. *Bank*, 133 U. S. 276; *Hollins* v. *Coal Co.*, 150 U. S. 371. As against creditors a corporation cannot give away its estate or distribute it among shareholders without equivalent. *Handy* v. *Stutz*, 139 U. S. 417. A corporation in debt cannot transfer its entire property so as to prevent the application of the property to the satisfaction of its debts. *Railroad Co.* v. *Pettus*, 113 U. S. 116; *Moline* v. *Iron Works*, 131 U. S. 352.

A corporation to which the property of another corporation is transferred, which is thereupon dissolved without providing for the payment of its debts, takes the property

subject to a lien in favor of the creditors of the old corporation to the amount of the property transferred. Jones on Liens, Sec. 85; *Brem* v. *Insurance Co.*, 16 Fed. 140; *Insurance Co.* v. *St. Louis Co.*, 13 Fed. 516; *Blair* v. *Railroad*, 22 Fed. 36; *Harrison* v. *Railroad Co.*, 13 Fed. 522. The assets of an insolvent corporation pass into the hands of others than *bona fide* purchasers, charged with a trust in favor of the creditors. *Curran* v. *Arkansas*, 15 How. 304; *Manma* v. *Potomac Co.*, 8 Pet. 281. And any device by which the assets are to be diverted from payment of debts is a fraud upon the creditors, and they may ignore a sale where both buyer and seller participated in the fraud. *Railroad Co.* v. *Evans*, 66 Fed. 819. And such buyer loses the property without reference to the amount or application of what he has paid. *Moore* v. *Clements*, 6 Wall. 299; *Lincoln* v. *Clafflin*, 7 Wall. 132.

*Mr. Samuel F. Phillips* and *Mr. F. D. McKenney* for the appellees Ball and others.

*Mr. O. B. Hallam* for Carrie H. Smith.

Mr. Justice MORRIS delivered the opinion of the Court:

1. A motion to dismiss the appeal has been made on behalf of Carrie H. Smith, formerly Carrie H. Golden, an intervenor in cause No. 15,907, on the ground that she has not been made a party to it, and that no citation has been served on her.

This motion is very plainly without merit. According to the record, Carrie H. Smith has no standing in this court for any purpose. Her claim has not been adjudicated. There is no decree for or against her. While the record before us does not so show, it seems to be conceded that upon her petition there was an order of the court making her a party to the suit, and presumably as a party complainant. But on her part it is specifically alleged that her interests are not identical with those of the original complainant, or

even similar to them, but, on the contrary, are rather antagonistic. And yet, upon such claim, antagonistic both to the complainant and the defendant, no service of process has been had upon any one, no answer has been required or made, no testimony taken in support of it, and no proceedings of any kind have been taken to bring it to a hearing. Her petition was filed almost at the last moment, when the testimony on both sides had all been taken and the cause was ready for hearing; and even if due diligence had been used in its prosecution, it would have been manifestly improper to have arrested for the convenience of the petitioner the litigation between the original parties. Original parties should not, under such circumstances, be deprived of the control of their cause, much less should they be required to take notice of a matter of which notice is required to be given to them, if the petitioner would have any action whatever by them. The mere filing of a petition and an *ex parte* order under it cannot compel parties to take notice of the petitioner on appeal or in any other way.

This motion to dismiss the appeal cannot therefore be entertained.

2. A second motion to dismiss the appeal has been advanced on behalf of the complainants in the first cause, No. 15,809, on the ground that the decree appealed from was only interlocutory. But this motion does not appear to be seriously insisted on, and certainly it requires no very great consideration. So far as the interests represented by the appellant are concerned, the decree is as final as it is possible for a decree to be. The sole issue between the Commercial Alliance Company and the Endowment Association in this suit was the question of the validity of the deed of conveyance from the latter to the former; and this was in fact the only issue between the Commercial Alliance Company and any and all the other parties. When that deed was held void and the Commercial Alliance Company was thereby held not to be entitled to the fund in court,

and an account was ordered preparatory to the distribution
of that fund among other claimants, the Commercial Alli-
ance Company had no interest in that accounting. The
whole claim of that company had been definitely deter-
mined and adjudicated, and the further proceedings ordered
could not in any manner affect that adjudication. It seems
to us, therefore, that this decree, as to the Commercial Alli-
ance Company, was so absolutely final and conclusive that
it would be only useless consumption of time to cite the
well-known authorities on the subject. We must, therefore,
hold that this motion also must be overruled.

3. From the statement heretofore made, it is quite appar-
ent that the pleadings have been left in a very imperfect
condition, so imperfect that, under ordinary circumstances,
a decree of dismissal would be amply justifiable in some
at least of the suits. There is a demurrer undisposed of in
the first cause, two demurrers undisposed of in the fourth
cause, no answer by the Endowment Association to the
third bill, and no proceedings to compel an answer or to
enforce a default, and apparently a total absence of replica-
tions everywhere. And we may observe that it would
have been more regular and better practice for the receiver
of the Commercial Alliance Company to have answered or
demurred in the name of his company rather than his own;
although we cannot hold that answering or demurring in
his own name, when he purports to do so in his official
capacity, is insufficient.

But it is clear that the second suit, that designated as No.
15,907, wherein the pleadings are in general sufficiently
regular and satisfactory, was treated by all the parties con-
cerned as the principal suit, and the others only as ancillary
to it, and for that reason consolidation was sought and had
of the three ancillary suits with the principal cause. As
the practical result of such consolidation, it may well be
assumed that the parties waived various irregularities of
pleading; and yet at the final hearing each party necessar-

ily must stand or fall by the record which he himself has made, or which has been made for him.

Consolidation of causes, it may be remarked, especially in equity, is always right and proper, whenever the conditions will justify it; and that is, whenever it becomes apparent that the ends of justice will be subserved by an investigation and determination of the whole controversy in a single suit. *Mutual Life Insurance Co.* v. *Hillmon*, 145 U. S. 285; *Mayor* v. *Coffin*, 90 N. Y. 313; Am. and Eng. Encyclopedia of Pleading and Practice, Vol. 4, Title, Consolidation, pages 673–705, and notes, where the subject is fully discussed and the authorities collated. And yet the exercise of the power should be carefully guarded, as it is frequently apt to lead to greater inconveniences than it prevents. At common law, it would seem that generally it ought not to be resorted to until after issue joined; for not until then does the propriety of it become manifest, inasmuch as to declarations substantially identical in form there might be defences radically different. But in equity, whenever the subject-matter is the same, even though the parties may be different, as when it is sought by a judgment creditor's bill to reach equitable assets, or when it is sought by a creditor's bill to subject the estate of a deceased person, not otherwise capable of being reached, to the payment of his debts, or when in any other way two or more persons are in equity pursuing the same identical assets, consolidation may be allowed at any time, even though the defences to the different claims may be entirely different. *Campbell's Case*, 2 Bland, 209; *Russell* v. *Chicago Trust, etc., Bank*, 139 Ill. 538; *Grant* v. *Davis*, 5 Ind. App. 116; *Biron* v. *Edwards*, 77 Wis. 477; *Cornell* v. *McCann*, 37 Md. 89; *Conover* v. *Conover*, 1 N. J. L. 403; *Woodburn* v. *Woodbnrn*, 23 Ill App. 289; *Schnell* v. *Clements*, 73 Ill. 613; *Thielmon* v. *Carr*, 75 Ill. 185; *Moore* v. *Froncis*, 17 Tex. 28. And it has been held that, when the consolidation is consented to by all the parties, as it evidently was in the present case, although no agreement to that effect has been

incorporated into the record, the parties in effect agree that the separate action shall be discontinued, and a new and distinct action shall be created in which shall be included and litigated all the questions presented by the pleadings in the former actions. *Anderson* v. *Boynton,* 14 Jur. 15 ; *Brown* v. *Hickie,* 68 Iowa, 330 ; *Castro* v. *Whitlock,* 15 Tex. 437.

The consolidated cause in the present instance, therefore, may be regarded as one instituted by the Endowment Association against the Commercial Alliance Company, wherein all the other complainants have intervened and become parties. And while it is true that the issues between the different parties remain to be determined in part or in whole, according to the pleadings which they have made in the several suits before consolidation, which rule would not be different if the pleadings had all been made in the first instance by the different parties in one suit, it does not follow that defect in the pleadings of any one or more of the parties will defeat the whole case, or that the presence in the record of issues undisposed of should be permitted to vitiate a decree upon other issues properly made and presented, when the former class may still be properly presented, as in this cause, in an accounting before the auditor. For, undoubtedly, under the decree directing an accounting in this case, not only those who have filed bills or have formally intervened by petition, but all holders of certificates of endowment may present their claims, and have them adjudicated ; and, consequently, it is not apparent that the pendency of a demurrer to a claim already presented by petition, or any other imperfection of pleading, should vitiate a decree for a general accounting based upon a bill of complaint, which was a proper basis for such a decree.

4. But it is suggested that the bill of complaint filed by the Washington Beneficial Endowment Association in equity cause No. 15,907, is not a proper basis for the decree that was rendered in the cause. That bill was simply to vacate the deed of conveyance of its real estate, other assets,

10 Ct. App.—23

business and good will made by the Endowment Associa-
tion to the Commercial Alliance Company, on the ground of
fraud in the procurement of that deed.    Apparently the bill
was not filed for the benefit of the creditors or certificate
holders of the association, but for its own benefit as a joint
stock organization and to enable it to continue to carry on
its business of insurance, which it had disabled itself from
carrying on by the attempted transfer thereof to the Com-
mercial Alliance Company.    But if the fact be, as claimed
by the president of the association in his testimony and
elsewhere in the record, that the Commercial Alliance
Company had become the owner of all the stock of the
Endowment Association, a court of equity could not lend
itself to a performance so absurd as would be the restora-
tion of property from the grasp of the Commercial Alliance
Company, as a company, to the possession of the same Com-
mercial Alliance Company as the sole stockholder and,
therefore, entire owner and proprietor of the Endowment
Association and of all its property and franchises.    The
suit, however, can be maintained in the name of the asso-
ciation as trustee for its creditors and certificate holders,
especially as by the consolidation such creditors and certifi-
cate holders have been made parties to the suit as complain-
ants, and others have intervened by petition; and the suit,
therefore, has virtually become a suit by creditors and cer-
tificate holders to reach the assets of an insolvent corpora-
tion for the satisfaction of their claims.    As such it would
seem to have been treated by all the parties; and as such cer-
tainly it was regarded by the court below at the hearing.
And inasmuch as there is a fund in court to be disposed of to
the person or persons to whom it equitably and justly be-
longs, and as it was in the power of the court to direct the
reformation of the pleadings so as to conform to the devel-
opment of the testimony, it does not seem proper that for
technical imperfection of pleading, if such there be, sub-
stantial justice should be refused to be done.    And the sub-

stantial question in this case is—to whom does the fund in court equitably and justly belong?   The pleadings and the testimony fairly present that question.

5. We come then to the merits of the case.   The court below held the transfer from the Endowment Association to the Commercial Alliance Company to be null and void, and adjudged that the fund in court should be held liable for the payment of the claims under the certificates of endowment issued by the association.   Was this adjudication correct?

We are not aware of any decision of the Supreme Court of the United States which modifies in any manner the doctrine stated by that court in the case of *Sawyer* v. *Hoag*, 17 Wall. 610, and followed and applied by it in the subsequent cases of *Upton* v. *Tribilcock*, 91 U. S. 45; *Sawyer* v. *Upton*, 91 U. S. 56; *Webster* v. *Upton*, 91 U. S. 65; *Hatch* v. *Dana*, 101 U. S. 205; *Morgan County* v. *Allen*, 103 U. S. 498, and *Scovill* v. *Thayer*, 105 U. S. 143, that the capital stock of a corporation constitutes 'a trust fund to which all its creditors can rightfully look for the satisfaction of their claims, which cannot be withdrawn without their consent.   On the contrary, that doctrine is reaffirmed in all subsequent cases. *Richardson* v. *Green*, 133 U. S. 30; *Hawkins* v. *Glenn*, 131 U. S. 319; *Fogg* v. *Blair*, 133 U. S. 534; *Peters* v. *Bain*, 133 U. S. 670; *Clark* v. *Bever*, 139 U. S. 96; *Fogg* v. *Blair*, 139 U. S. 118.   It is only qualified by the proviso that a corporation may dispose of its stock, or any property into which such stock has been converted, in good faith to creditors in discharge of its debts, or may sell or dispose of it to *bona fide* purchasers for a valuable consideration.   *Fogg* v. *Blair*, 133 U. S. 534; *Clark* v. *Bever*, 139 U. S. 96.   It is very clear from the testimony in the present case that the real estate and personal property transferred by the Endowment Association to the Commercial Alliance Company was all that there was to represent the capital stock of the association; and that it was, therefore, in view of the decisions which

have been cited, a trust fund for the benefit of creditors, to be held subject to the payment of their claims, unless it was transferred in good faith in payment of debts or to a *bona fide* purchaser for a valuable consideration. Our inquiry then must be directed to ascertain whether the Commercial Alliance Company was a *bona fide* purchaser for a valuable consideration; and this inquiry ought not to be difficult of determination.

Throughout the whole transaction between the Washington Endowment Association and the Commercial Alliance Company, the latter was represented by its president, E. A. Dunham, who, either in person or by an agent, conducted the entire negotiation. The good faith of the Commercial Alliance Company is, therefore, to be determined by the knowledge and good faith of its president. And it may be added that the transaction on the part of the Washington Endowment Association was likewise managed throughout by its president, Lawrence Gardner.

Now, that Mr. Dunham knew the financial condition of the Endowment Association, its hopeless insolvency, and the condition of the claims against it, is too clear from the testimony to be seriously questioned. Indeed, it seems to have been part of the peculiar business of his company to seek out and absorb the assets and business of such associations. And it is equally clear that he represented his own organization, the Commercial Alliance Company, to be in good financial condition and amply able to carry into effect its agreement with Gardner and the Endowment Association for the reinsurance of the members of the latter, when, in fact, that financial condition was bad and the subsequent proceedings against his company in the State of New York, resulting in its dissolution and the placing of its affairs in the hands of a receiver for a final disposition of its assets, conclusively demonstrated its inability, even at the time of the agreements between himself and Gardner, to do what it undertook to do for the benefit of the members of the

Endowment Association, even assuming that all those members could be coerced or cajoled into the acceptance of the terms held out to them.   Whether he made those representations and entered into the agreements in ignorance of the actual condition of his own company, or with full knowledge of it, is of no consequence, if the representations were in fact false and the agreements entered into upon the faith of them, operated as a fraud upon the rights of the creditors of the Endowment Association.   Nor is it of any consequence, so far as these creditors are concerned; that those who managed the transaction in the name of the Endowment Association, may not have been unwilling to be misled in consideration of the present benefit to the stockholders of that association.   The fraud upon the association and upon its creditors and certificate holders remains the same.

The property of the Endowment Association which was attempted to be transferred to the Commercial Alliance Company is shown to have been worth at the time between $35,000 and $40,000; and yet for this property and for the business and good will of the association, the Commercial Alliance Company paid only $14,000, a consideration so grossly inadequate as to be itself a badge of fraud.   But it is claimed that there was a further consideration, namely, that the Commercial Alliance Company should take care of some accruing or accrued liabilities of the Endowment Association to its certificate holders, amounting to about $26,000, which sum was to be paid only, if at all, out of such collections as might be made from the assessments sent out or to be sent out in the name of the Endowment Association, and which, with the $14,000 paid in cash, would make a total consideration of $40,000.

But even if this portion of the alleged consideration was made or promised in good faith, which all the facts and circumstances controvert, yet it wholly failed, and the insolvency of the Commercial Alliance Company was an abso-

lute bar to its performance.   For this failure of considera-
tion, upon any reasonable theory of the case, the parties in
interest were entitled to have the contract rescinded.   In-
deed, we do not understand that this position is very seri-
ously controverted by the appellant.   His substantial
claim, and the only claim that can be urged with any ap-
pearance of plausibility, is that the rescission should be al-
lowed only on the condition of the repayment of the $14,000.
But even this position we deem untenable.

If, as is the contention on behalf of the complainants,
the payment of $14,000 was made for the purchase of the
stock of the association, so as thereby to enable the Com-
mercial Alliance Company to become the sole stockholder
of the association and through such ownership to become
possessed of all its assets, it is very evident that there was
no consideration whatever for the transfer of the real es-
tate and other assets by the association to the Commercial
Alliance Company.   If, on the other hand, this payment
of the $14,000 was actually on account of the property, as
is claimed by the appellant, it is beyond all reasonable
doubt that the payment was with full knowledge on the
part of Dunham that it was to be diverted from its proper
purpose as a trust fund and distributed among the stock-
holders of the association in fraud of the rights of the
creditors; and to this fraud he was a co-operating party.
In either aspect of the case, it is clear that the Commercial
Alliance Company has no just right to set off that sum of
$14,000 against the claims of the creditors of the associa-
tion, or in other words, to insist upon its repayment as the
condition of the rescission of the contract.

There is a contingency, it is true, although under the
circumstances of the case extremely remote, in which the
Commercial Alliance Company would be entitled in an
accounting before the auditor to claim this sum or any bal-
ance of it that might remain undisposed of; and that is,
in the event that it should be found that the claims of the

creditors and certificate holders did not exhaust the funds in the hands of the receivers or the assets of the association. In that event, of course, any residue undisposed of would go to the Commercial Alliance Company, and it would be of no consequence whether it would so go because that company had become the sole owner of the stock of the association, or because on general principles of equity it should so go.

It is needless to pursue the subject farther.   Mr. Justice Cox, who heard the cause in the court below, has filed in it a most able and elaborate opinion; and we have no hesitation in subjoining it herewith and adopting it as our own.

From what has been said, it follows as our opinion that the decree of the Supreme Court of the District of Columbia rendered in these consolidated causes should be *affirmed. with costs; and that the causes should be remanded back to that court for the purpose of the audit directed by that decree, and for such further proceedings as may be proper in the premises.   And it is so ordered.*

The opinion of Mr. Justice Cox, on the hearing in the court below, and which was adopted by this court, was as follows:

I have been considering the case of the Beneficial Endowment Association against the Commercial Alliance Company and others, together with the other cases which have been consolidated with it.   Before speaking of the facts of the case perhaps it would be well to lay down some general principles of law bearing upon the relation of corporations to their stockholders and creditors, etc.

I do not think there is anything better settled in the law of corporations than that when the affairs of a corporation approach a condition which calls for liquidation, the creditors of the corporation have a right to be satisfied in full out of the assets before the stockholders can participate at all.   That was settled fully in the case which

was cited in the argument of *The Railroad Company* v. *Howard,* 7 Wall. 392. In that case it appears that a corporation had its property under several mortgages for a larger amount than the property was worth, and an arrangement was made by which one of the mortgages was to be foreclosed and the property sold out, and it was to be bought in for the benefit of another company to be organized, and then the purchase price was to be paid in the bonds of that new company, and it was agreed that those bonds should be applied to pay off sixteen per cent. of the capital stock belonging to the stockholders of the first company, and the rest of it should go to the creditors secured by these mortgages. That deal was carried into effect so far that the mortgage was foreclosed, the sale took place, and their share of the bonds of the new company was paid over to the bondholders who were secured by these mortgages. But in that arrangement no provision had been made for another class of creditors, and these creditors in the meanwhile had obtained judgments against that corporation on their guaranty of certain municipal bonds, and they filed a bill to claim that the residue of those bonds of the new company which had not been distributed should be applied to the payment of the claims of those creditors. It was not deemed necessary by the court to set aside the foreclosure; in fact, there was no ground for it, because the foreclosure was legitimate and the mortgages were valid, and the bondholders were entitled to the foreclosure, and furthermore it did not appear that the bondholders had notice of the other debts. The court interfered by intercepting the proceeds of that sale and required the bonds intended to pay off the sixteen per cent. of the stock to be given to the creditors instead of going to stockholders, and Judge Clifford used this language:

" Equity regards the property of a corporation as held in trust for the payment of the debts of the corporation and recognizes the rights of creditors to pursue it into whose

ever possession it may be transferred, unless it has passed into the hands of a *bona fide* purchaser, and the rule is well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profit until all the debts of the corporation are paid. Assets derived from the sale of the capital stock of the corporation or of its property become, as respects the creditors, the substitutes for the things sold, and as such they are subject to the same liabilities and restrictions as the things sold were before the sale and while they remained in the possession of the corporation. Even the sale of the entire capital stock of the company and the division of the proceeds of the sale among the stockholders will not defeat the trust nor impair the remedy of the creditors, if any debts remain unpaid, as the creditors in that event may pursue the consideration of the sale in the hands of the respective stockholders and compel each one, to the extent of the fund, to contribute *pro rata* towards the payment of their debts out of the moneys so received and in their hands. Valid contracts made by a corporation survive even its dissolution by voluntary surrender or sale of its corporate franchises, and the creditors of the corporation, notwithstanding such surrender or sale, may still enforce their claims against the property of the corporation as if no such surrender or sale had taken place.

"Regarded as the trustee of the corporate fund, the corporation is bound to administer the same in good faith for the benefit of creditors, the stockholders, and all others interested in its pecuniary affairs, *and any one receiving any portion of the fund by voluntary transfer or without consideration may be compelled to account to those for whose use the fund is held.* Creditors are preferred to stockholders on account of the peculiar trust in their favor and because the latter, as constituent members of the corporate body, are regarded as sustaining in that aspect the same relation to the former as that sustained by the corporation "—*i. e.*, their debtors.

Objection was made that the stockholders themselves ought to have been made parties, and in reply to that the court said : "The next objection is that there is such a want of parties that a court of equity cannot grant the relief as prayed.   The principal suggestion in support of this proposition is that the stockholders should have been made parties, but the court is of a different opinion, because their interest is fully represented by the parties before the court.   Respondents in the suit are the two railroad companies and the committee or trustees chosen and appointed by the stockholders and bondholders through whom the provisional arrangement was perfected and the contract of sale was carried into effect."

Now, that language of the Supreme Court was rather explained than modified in later cases, in consequence, perhaps, of some misapprehension on the part of counsel, who contended that all of the property of the corporation is subject to a perpetual lien in favor of the existing creditors of a corporation, so that the property cannot be transferred at all except subject to that lien.   That would hamper the operations of the corporation too much and prevent them from making a sale of any property; but that idea was not countenanced by the Supreme Court, and the subject was further discussed in the case of *Hollins* v. *Brierfield Coal Company,* 150 U. S. 371.   That suit was a bill filed by a simple contract creditor upon the theory that all the property of a corporation is subject to a perpetual trust in favor of creditors, and a court of equity had a right to administer it as a trust fund, even without any judgments in favor of the creditor.   Referring to the case of *Terry* v. *Anderson,* Chief Justice Waite makes the following observations : "Ordinarily a creditor must put his demand into judgment against his debtor and exhaust his remedies at law before he can proceed in equity to subject choses in action to payment. To this rule, however, there are some exceptions, and we are not prepared to say that a creditor of a dissolved cor-

poration may not, under certain circumstances, claim to be exempted from its operation. If he can, however, it is upon the ground that the assets of the corporation constitute a trust fund which will be administered by a court of equity in the absence of a trustee, the principle being that equity will not permit a trust to fail for want of a trustee."

Then the court proceeds in this case: "While it is true language has been frequently used to the effect that the assets of a corporation are a trust fund held by a corporation for the benefit of creditors, this has not been to convey the idea that there is a direct and express trust attached to the property. As said in 2 Pomeroy's Equity Jurisprudence, 1046, they 'are not in any true and complete sense trusts, and can only be called so by way of analogy or metaphor.'" And then referring to the contention that a corporation's debtors stood upon a different footing from the individual's debtors: "We do not concur in this view. It is at war with the notions which we derive from the English law with regard to the nature of corporate bodies. A corporation is a distinct entity. Its affairs are necessarily managed by officers and agents, it is true, but in law it is as distinct a being as an individual is, and is entitled to hold property (if not contrary to its charter) as absolutely as an individual can hold it. Its estate is the same, its interest is the same, its possession is the same. Its stockholders may call the officers to account and may prevent any malversation of funds or fraudulent disposal of property on their part. But that is done in the exercise of their corporate rights, not adverse to the corporate interests, but coincident with them. When a corporation becomes insolvent it is so far civilly dead that its property may be administered as a trust fund for the benefit of its stockholders and creditors. *A court of equity, at the instance of the proper parties, will then make those funds trust funds, which in other circumstances are as much the absolute property of the corporation as any man's property is his.*

"With reference to the suggestion in this last paragraph it may be observed that the court does not attempt to determine who are proper parties to maintain a suit for the administration of the assets of an insolvent corporation. All that it decides is that when a court of equity does take into its possession the assets of an insolvent corporation *it will administer them on the theory that they in equity belong to the creditors and stockholders rather than to the corporation itself.* In other words, and that is the idea which underlies all these expressions in reference to 'trust' in connection with the property of a corporation, the corporation is an entity, distinct from its stockholders as from its creditors. *Solvent, it holds its property as any individual holds his, free from the touch of a creditor who has acquired no lien; free also from the touch of a stockholder who, though equitably interested in, has no legal right to, the property. Being insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the creditors, place the property in a condition of trust, first for the creditors and then for the stockholders.* Whatever of trust there is arises from the peculiar and diverse equitable rights of the stockholders as against the corporation in its property and their conditional liability to its creditors. It is rather a trust in the administration of the assets after possession by a court of equity than a trust attaching to the property as such for the direct benefit of either creditor or stockholder."

And again, further, they say: "*The property of a corporation is doubtless a trust fund for the payment of its debts in the sense that when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before distribution thereof among the stockholders.* It is also true in the case of a corporation as in that of a natural person that any conveyance of property of the debtor without authority of law and in fraud of existing creditors is void as against them."

Again in *Fogg* v. *Blair*, 133 U. S. 534, the court say: "We do not question the general doctrine invoked by the appellant that the property of a railroad company is a trust fund for the payment of its debts, but do not perceive any place for its application here. That doctrine only means *that the property must first be appropriated to the payment of the debts of the company before any portion of it can be distributed to the stockholders.* It does not mean that the property is so affected by the indebtedness of the company that it cannot be sold, transferred, or mortgaged to *bona fide* purchasers for a valuable consideration except subject to the liability of being appropriated to pay that indebtedness. Such a doctrine has no existence." In other words, as long as the corporation is engaged in the prosecution of its business it has the same right as any individual has to pass a good title to *bona fide* purchasers, but at the moment when that condition of affairs arises that the business of the company is at a stand-still, and the question arises as to the distribution of its assets, especially between stockholders and creditors, at that moment the right exists in the creditors to have that property appropriated first to the payment of their debts.

Now, whether you say that at that moment a lien arises in favor of a creditor or that the property becomes subject to a trust in favor of creditors, or, in the language employed in 101 U. S., "that a court of equity, at the instance of a proper party, will then make these funds trust funds," or that a trust fund exists before or after a suit is commenced, whatever view theoretically is taken of it, the right exists on the part of the creditors to have the property so appropriated, and that right is enforceable and can only be enforced in equity. The property then becomes a trust fund and the creditors acquire a lien upon it. The right is unquestionable, and it is the duty of the court under those circumstances to sequester those funds and appropriate them first to the payment of creditors.

These general principles, perhaps, I had better fortify by another authority, Morawetz on Private Corporations, Section 797, in which it is said: "Creditors of a corporation are entitled to the usual equitable remedies for the protection of their rights. They are therefore entitled to an injunction to restrain any threatened waste or diversion of the corporate assets which would result in the destruction of their security, and thereby cause them irreparable loss. If the managing agents who are in charge of the company's assets are the persons threatening the wrong, a receiver may be appointed to take the property of the company out of their hands. Accordingly, in *Conro* v. *Gray*, a receiver was appointed at the suit of a simple contract creditor to prevent the agent of a corporation from committing waste and misapplication of its funds to the complainant's injury. Justice Paige said: 'Horace Gray, as president of the Port Henry Iron Co., was a trustee of the creditor's company. His assignment of the property, which belonged to the company, was of a trust fund for the payment of its creditors, and such creditors have claims on such fund for the payment of their debts, have a right before proceeding to judgment and execution to file a bill against the corporation and the assignees of Gray to prevent a misapplication of the trust fund, and to secure its application to its legitimate uses, viz., the payment of the debts of the company; and the court to accomplish this object may appoint a receiver or require security for the due preservation and appropriation of the property.'"

The scheme of this association was such, it seems to me, that it could never have been a success except so long as its numbers were recruited by fresh members from time to time. If the membership remained permanent, of course the older the members grew the more frequent the deaths and the more numerous the assessments, until at last it would be more advantageous for the policy holders to drop out and cease paying their assessments than to remain in

the association; and that seems to be the condition that this company had arrived at about the summer of the year 1894. Its president, Mr. Gardner, then entered into an arrangement with the Commercial Alliance of New York by which the Beneficial Endowment Association undertook to sell out to the former all its assets and business and to transfer all its obligations as far as that was practicable. This was virtually a dissolution.

At this point it is important to consider what its assets and liabilities were at that date. It had a liquidated indebtedness at that time of twenty-two thousand dollars or more, and it had a contingent liability to policy holders of several million dollars. Now, what were the resources? In the argument some allusion has been made to some premium notes and assessments, as if they were assets of the company. Now, in the first place, the assessments were never, in any proper sense, assets. The policies never imposed upon the policy holders any indebtedness—any obligation to pay. These assessments were payable or not at the pleasure of the policy holders, the only penalty for nonpayment being to forfeit all rights under the policy, but they could not be sued on, and they were in no sense choses in action, and did not constitute assets of the company. It is further doubtful if the premium notes could be called assets, or whether they could have been sued upon at all, because the stipulation, if I recollect, was that these premium notes were simply to be deducted from the amount payable upon the policy; but as to both it may be said that this very transaction would destroy any right of action, if any such existed, and put an end to these as a resource of the company, because this transfer of all the assets of the company to another company, which we will speak of, was a complete breach of the contract, which put an end to all claim whatever against the policy holders of the company.

A question of this sort arose in a somewhat different form in the case of *Lovell* v. *The St. Louis Mutual Life Insurance*

*Company,* 111 U. S. 264.   There a party had a policy of insurance on his life and was entitled to have it converted into a paid-up policy.   He presented his policy and demanded a paid-up policy.   Instead of that, after some delay, he was informed that the company had sold out to another company, transferred all its business, and then he brought an action upon this policy to recover the value of his policy.   The Supreme Court says: "In the meantime the company conveyed all its assets to another company, and transferred to such other company all its business and all interest in its outstanding policies, and completely and utterly *put it out of its own power to fulfil any of its obligations and virtually went out of existence.*   Under these circumstances we hold, first, that the complainant Lovell was in no default, and that he did not forfeit his rights under his policy; second, *that he was under no obligation to continue his insurance, either under his original policy or under a paid-up policy, with the new company,* to which the St. Louis Mutual Life Insurance Company transferred its business; third, that since the latter company totally abandoned the performance of the contract made with the complainant and transferred all its assets and business to another company, and since the contract is executory and continuous in its nature, *the complainant had a right to consider the contract at an end,* and to demand what was justly due to him by reason of its abandonment by the company."   Again they say: "That complainant was under no obligation to continue his insurance in the new company, we think is equally clear. He had nothing to do with that company; it was a stranger to him.   It is true that it received all the old company's assets and assumed all its obligations on policies and otherwise, and the complainant was relegated to the new company for the obtainment of his rights, whatever they were, but that was a transaction between the companies themselves with which he had nothing to do, and under such a total change of relations and parties it would be most

unreasonable that he should be compelled, against his will or with the alternative of abandoning all his rights, to continue all his life to fulfill an executory contract by the payment of premiums to a company to which he was a total stranger and in which, perhaps, he reposed no confidence whatever, or to take a paid-up policy in such company."

So that this act of the Beneficial Endowment Association in selling out to the Commercial Alliance and undertaking to transfer all its assets and obligations was an entire breach of its contract with the policy holders of the first company. They could claim nothing from those policy holders, and therefore neither the premium notes nor the assessments could be treated as assets of the Beneficial Endowment Association.

Then, according to the testimony of Mr. Gardner, the only property liable for the payment of creditors was this office building on Tenth street. What was done? Looking at this transaction as the papers present it, it was a sale by the Beneficial Endowment Association to the Commercial Alliance of all property of the former company—its whole property. Nothing was received for that property in money except $14,000, which was less than half and a little more than one-third of the value of the property, and that money was immediately divided among the stockholders and not one dollar was left for creditors. This might be atoned for, perhaps, if it had appeared that the policy holders and the creditors of the company had been properly provided for otherwise.

Let us see whether they were provided for in any sense. We will take first the case of the policy holders. The contract of the Commercial Alliance, which was supposed to contain a provision for the benefit of those policy holders, contained this provision: "That the party of the first part (Commercial Alliance) shall submit its policies, a copy of which is hereto attached, to the members of the party of the second part without medical examination *and at their*

10 Ct. App.—24

*present ages,* not exceeding in amount the policy now held by them in the party of the second part, said policy to be based in each case upon the statements made in the application and medical examination in connection with said application for the insurance upon which the policy was issued and any subsequent application for reinstatement thereof or for any continuation of the same by the party of the second part."

Now, under the policy received from the Beneficial Endowment Association the rates of assessments, of course, were fixed according to the age of the applicant at the time the application was made. Take the case of Mr. Ball, for example. He took out several policies; first in the year 1877, seventeen years before the transaction took place. Of course, the rate fixed was the rate appropriate to his age, he being at that time a young man, and the last of his policies was taken out in 1884, ten years before this transaction. The rates were not changeable; they were fixed rates during all of his life. Now he has grown to be an old man, and he is turned over to this new company and they say they will give him a policy *at his present age,* the rate to be paid, perhaps, twice as much as he had to pay before. That is one aspect in which the new policy differed from the policy already held. Again, under the new policy proposed, instead of paying assessments when deaths occur they are compelled to pay assessments every two months absolutely. In the next place, he is bound to pay a new premium (he has already paid one) for the first year, making two premiums instead of one. In the next place: "This policy may be continued in force by the payment of premiums *in such amounts as may be hereafter required by the said company (not to exceed, however, the maximum rate for the attained age of the insured printed in the table of rates on the back hereof)* upon the dates hereinbefore specified, *and if any variations be made from the amount of the last prior premium thirty days' notice thereof shall be given the insured hereunder."* That is to say,

as he grows older the premium may be increased every year, not to exceed the maximum rate for the attained age, so that, instead of having a fixed premium to pay, his premium may be increased constantly with his increasing years.

But the most remarkable feature, perhaps, of all is that the company does not bind itself to pay any amount whatever. They promise, in consideration of the payment of these premiums, to pay, within ninety days after acceptance of proof of death, *a sum not exceeding* $5,000. What amount do they promise to pay? How can an action be maintained on such a policy? It seems absolutely void for uncertainty. And another feature probably as remarkable as that is that the place of the contract is to be considered the home office of the company in the city of New York, *and that it shall be governed and construed according to the laws of New York.* So that what is offered to the policy holders of the Beneficial Endowment Association is not a protection of the contracts which they already held, but a substitute contract altogether vague, more onerous in its terms, and utterly devoid of any certainty. Not ten per cent. of the policy holders consented to those terms. It is a wonder that any one ever did consent, knowing the full import of these stipulations. So that it is perfectly plain that the contracts were not protected in any way. The only consideration offered by the new company for the policy holders who should enter upon this contract was that they would not exact a new medical examination. They would dispense with that and act upon the original medical examination and the applications filed by the policy holders in the Beneficial Endowment Association.

Then the creditors claiming for the amounts due for death were creditors who had *liquidated* claims. Was there any provision made for them? In terms the contract between the parties makes no provision at all for them. The only thing which it is claimed constituted a provision for them was that the Commercial Alliance promised to pay,

in addition to the sum of $14,000, a commission of twenty-five per cent. of the first year's premiums received upon the policies to be issued to the policy holders of the Beneficial Endowment Association by the Commercial Alliance Company under this agreement—that is, they were to pay twenty-five per cent. of the first year's premiums of the business turned over to them by the Beneficial Endowment Association, provided said members paid the premiums called for in said policies within thirty days from the date thereof, said commissions not to exceed a total of $26,000.

As we have seen before, the terms offered to the policy holders of the Endowment Association were such that no fund could possibly be expected to exist out of which this money was to be realized.   In point of fact, instead of one hundred thousand dollars' worth of business transferred from one company to another, the Commercial Alliance Company received only fifteen hundred dollars in premiums, and instead of twenty-five thousand as the fourth of said anticipated business, the one-fourth did not amount to $400, and even that was not paid over.   We have nothing but Mr. Gardner's testimony that he intended to apply this twenty-five per cent. to the payment of these liquidated death claims—*i. e.*, to pay them out of a fund which had then no existence, and which had a mere conjectural existence at best, and that is the only security provided for these claims.

So that by the arrangement all the property of the association was sold for less than half of its value, which was paid into the hands of the stockholders, and nothing was reserved for the creditors except this vague and shadowy expectation of Mr. Gardner.   Counsel advised him to insist upon security for the payment of this twenty-five per cent. He would not even exact that, professing confidence in Mr. Dunham, of the Commercial Alliance, that when this fund was realized, which he had no right to expect, and which

Dunham never did receive, he, Dunham, would pay it over for the benefit of these creditors.

Of course, such a transaction as that, it is hardly neces_sary to say, is perfectly indefensible. We had before us some time ago the case of *Edwards* v. *Entwistle*, 2 Mackey, 43, in which it appeared that a party who was largely indebted conveyed his property to his family, but he had a prosperous business at the time, and he had very good reason to expect that he would be able to pay all of his debts out of the profits of his business. In this expectation he was disappointed, and his creditors filed a bill to set the settlement on his family aside, and there we held—I happened to deliver the opinion on that occasion—in the language of another case, that a debtor has no right to settle his property upon his family and leave nothing but *expectations* for his creditors. That, however, was a more favorable case than this, because the debtor had more than vague expectation, having a prosperous business and good reason to expect he would be able to pay his debts out of the proceeds of the business, but we held that that was not what he was bound to do. He was bound to protect his creditors first and not to reserve for them nothing but expectations. In this case the Beneficial Endowment went out of business entirely, and the creditors had nothing but the vague expectation of the president, Mr. Gardner, that the fund in question would be realized in the future, founded upon the unsecured promise of a stranger.

But another feature of this transaction is that these contracts with the Commercial Alliance could not have been enforced in any respect. The payment of $14,000 to the stockholders was either a redemption and extinguishment of their stock or it was a purchase by the Commercial Alliance. I think it must be regarded as the former, because under the laws of New York I have no doubt (as was testified) the corporation existing there had no right to invest its means in the stock of another company. Looking at it

in that view, then, what is the effect of paying $14,000 to the stockholders? It was a simple extinguishment of the stock. From the moment that money was received they ceased to be stockholders. We know that the old rule of the common law was that the corporation expired upon the death of all of its members; and so also if the members ceased to be members, the corporation must cease, too. There cannot be a stock corporation without stockholders. This was a stock corporation, and the trustees had to be elected from the stockholders and the president elected from the trustees, so that the result of this transaction was that there were no stockholders, trustees or president. If it was sought to enforce these contracts, who could bring the suit? Certainly, nobody. The corporation had dissolved itself. It had vanished into thin air. The promises of the Commercial Alliance were made to a mere phantom and could not be enforced.

But taking the other view, viz., that the stock was acquired by the Commercial Alliance, and that the Commercial Alliance had thereby become the owner of all the stock of the Beneficial Endowment, they would become the Beneficial Endowment, if that was a legitimate transaction. It would be two companies, the Commercial Alliance of New York and the Beneficial Endowment of Washington; and then how could these contracts be enforced? The same company, as the Washington Beneficial Endowment, would be asked to bring suit against itself as the Commercial Alliance of New York. It would be the case of Dr. Jekyll suing Mr. Hyde. Such a security as that is utterly delusive and impossible; so that these contracts could not, under any circumstances, have been enforced, which is another evidence that neither the policy holders nor the creditors were in any way whatever protected.

It amounts to this, then, as I say, that all the available property of this company was sold for less than half its value and the money divided among its stockholders, and

the creditors and policy holders left completely out in the cold without anything whatever; and such a transaction is the very transaction of all others which invokes the interposition of a court of equity.

There can be no question here about a *bona fide* purchaser. If the Commercial Alliance had been a *bona fide* purchaser without notice, it might be that the only resort of the creditors would be against the stockholders who had received the proceeds. But it is perfectly plain from the evidence that the Commercial Alliance, through its president, was privy to the whole transaction; a *particeps criminis*, if you can call it a crime. Dunham not only knew of the indebtedness of the company, but he knew perfectly well that the $14,000 which he paid for the property was to be distributed among the stockholders. He was informed from the very beginning that the deal could not take place unless he bought all of that stock. He objected that the company could not invest in the stock of any company, but the difficulty was tided over by giving the transaction the form of a purchase of the property and leaving Mr. Gardner to apply the proceeds to the payment of these stockholders. This is just the case to which the language of Justice Clifford, heretofore cited, is applicable: "If the fund has been distributed among the stockholders or passed into the hands *of other than bona fide creditors or purchasers,* leaving any debts of the corporation unpaid, the established rule in equity is that such holders take the fund charged with the trust in favor of creditors, which a court of equity will enforce and compel the application of the same to the satisfaction of their debts." The same rule was asserted in the case in 151 U. S., which was cited.

So much for the general principles of equity jurisprudence as applied to this case.

There is another feature of the case which deserves some comment, and that is the effect of the by-law which has been strongly relied upon in the argument as creating a

trust for the benefit of creditors.   A committee was appointed to revise the by-laws of this association, and they made a report in which they say, looking far into the future: "The members of the board feel the full responsibility of their position, and your committee have no doubt whatever that so long as a majority of the present stockholders live to control the affairs of the association there will be no danger of its dissolving 'like a rope of sand,' or as so many of the old-line life insurance companies have dissolved within the past few years; but in all probability, while yet a majority of those who now constitute the membership of our different classes shall yet be alive, a majority of the present board will have passed away, and, having established this association upon principles which we believe will insure its stability and permanency and *afford absolute security to the holders of its certificates of endowments,* it is plainly our duty to provide, so far as human foresight will permit, for the carrying out of those principles honestly and intelligently by those who shall succeed us and who one by one shall take our vacant places as members of the board of trustees of the Washington Beneficial Endowment Association.   The only danger to the association in the years to come is that at some period in its history its affairs may come to be controlled by men who will leave the safe and honorable course which we have marked out and intended to pursue, and will look alone to their own selfish interests. It seems to your committee that the only plan by means of which we can be assured that the affairs of the association will be permanently kept in proper hands is that of providing for the purchase of its own stock at a fixed value by the association.   If such right is not reserved to it, a majority of the stock will be liable, in the course of time, to get into the hands of parties who will be ready to sell their shares to any one who will give the highest price for them, so that there will be the danger of a combination of purchasers, and a controlling number of the shares by parties

who might in the future *apply any reserve or surplus fund on
hand to their own uses,* and thus probably make good in the
case of our association the predictions of those who assail
the assessment plan of life insurance, and this possibility
we should carefully guard against." And then the board
is asked to approve and adopt certain by-laws to prevent
all these: "Your committee believe that the by-laws herein
presented will meet all the difficulties in the way, and their
adoption will greatly tend to secure perpetuity to the asso-
ciation, *and consequently, safety to the certificate holders.*" They
would recommend so and so, and then come down to arti-
cle 17: " *The capital stock, together with the reserve fund and
surplus fund, shall be held at all times liable for the security of
the certificate holders.*"

So that the avowed purpose of amending these by-laws
was to give better security for the policy holders, and to that
effect they declare that the capital stock, together with the
reserve fund (and this property which was sold was the
whole surplus fund left), should be held at all times liable
for the security of the certificate holders. This by-law did
not mean any more than the general principles of equity,
requiring that the property should be so far liable all the
time to the claims of creditors that it could not be disposed
of to the benefit of stockholders. Undoubtedly this surplus
fund was a variable fund and might be changed, invested
in new property, and reinvested all the time, but what the
by-laws meant was that whenever an occasion should come
for a creditor to assert his rights then this fund should be
deemed pledged for his security. If so, it made this fund
a pledge and a trust fund for creditors.

Now, what is the effect of this by-law? It seems to me
that a by-law is as much a law as the charter itself. Con-
gress declares that the trustees shall have power to make
such prudential by-laws for the disposal of the stock and
the conduct of its business affairs, etc. Nobody questions
the validity of this law. This by-law was passed in pursu-

ance of an act of Congress, and it could only be passed and altered by the trustees. Undoubtedly the trustees could repeal the by-law, but until it is repealed it has the force of law For illustration, let us look at several of the preceding sections. In section 555 it is declared that "the trustees shall be annually elected by the stockholders at such time and place as shall be determined by the by-laws of the company." Section 556 provides that a vacancy among the trustees "shall be filled in such manner as may be provided by the by-laws of the company." Suppose an election should take place not in conformity to these by-laws, would it be a legal election? It seems to me clearly not; and, if not, it must be because the by-law while in force was binding upon the corporation as much so as the charter itself. And so long as the present by-law was in force it was as much the law of the corporation and as binding on the officers and stockholders as the charter under which it was organized. So that this property was constituted, as I hold, a trust fund for creditors by virtue of this by-law as effectually as if Congress itself had declared it such. The creditors had the right to resort to this as a trust fund for their benefit. I think, therefore, the by-laws furnish as much ground for relief as the general principles of equity which I have been discussing.

And another fact about the case not to be passed over is that the existence of this by-law was especially called to Dunham's attention, and his counsel warned him that it would constitute a lien upon the property, and his only answer is that Mr. Gardner told him that the by-law had been repealed, but there is no evidence to that effect. There could be no repeal except by the trustees, and there were no trustees acting at that time.

Another question suggested is whether this $14,000 ought to be refunded to the Commercial Alliance Company. It is claimed that wherever a contract is sought to be rescinded it is the duty of the party exacting that relief to restore all

the consideration he has received from the contract. But no such contention, it seems to me, can be made against the creditors; the money was not paid to them. The Commercial Alliance, with the connivance of the president of the other association, bought the property belonging to these creditors and paid the money to the stockholders, who were not entitled to it upon any conceivable grounds. The creditors cannot be required to ratify an illegal sale and then to turn around and enforce their rights against some twenty or thirty stockholders by separate actions. It might as well be said that if a man steals my horse and disposes of it to another person, I cannot claim it without refunding the price to the buyer. No such condition as that can be exacted by the Commercial Alliance before proper relief can be given in this case.

I do not think it necessary for the purpose of this case to impute to Mr. Gardner any deliberate intention to defraud these policy holders. I do not think that was his primary object. His object was to unload this unprofitable stock, and in doing that he certainly failed to do his duty toward the creditors and policy holders of the association, and this amounted to a constructive fraud at least. It is a case of constructive fraud and a case of implied trust which gives the court the right to grant relief. The whole transaction was effected by Mr. Gardner under proxies from the stockholders, and Mr. McConville, who was made a stockholder for the purpose of the transaction, and the main body of the stockholders, as far as appears, knew nothing about the details at all. They were very glad to sell the stock, but the whole responsibility for the transaction rests upon the president of the company and not upon those stockholders.

Now, the question has been made whether the bills of complaint contained the proper averments to authorize relief. In the argument it was contended that this conveyance was void as fraudulent under the statute of 13 Elizabeth. It was on the other side claimed that there is no

averment that there was express fraud under the statute of Elizabeth to cheat and defraud creditors. There is no such averment in any one of those bills which are consolidated, but they all proceed on the ground of trust. Mr. Ball's bill, for instance, proceeds upon the ground that they are entitled to recover the present equitable value of their claims. "And because of such non-concurrence the said transaction and all conveyances thereunder of real or personal assets were irregular, and therefore converted the persons to whom they were made *into trustees on behalf of the plaintiffs and others having like claims.*" In Mr. Edwards' bill, as administrator of Buchly, it is claimed: "The said endowment association had accumulated what was commonly known and distinguished as 'endowment,' 'reserve,' and 'surplus' funds, consisting of property both real and personal, which, together with the capital stock of said association, was held liable for the security of the said Nalley as such certificate holder and your complainant as the beneficiary thereunder, *and constituted a trust for and subject to the claims of your complainant which have become vested right and a valid lien against said real estate and against the other property and funds aforesaid by virtue of the by-laws and amendments thereto and by reason of the premises aforesaid,* and that under the contract relations existing between the said Endowment Association and the said Nalley and the legal representative of the said Buchly and by reason of the premises the said Endowment Association was at the time of the death of said Nalley, and has since continued to be, and is now, a trustee holding real estate and premises and funds and property for the benefit of your complainant as such beneficiary;" in other words, the Commercial Alliance took the property charged with a trust.

The Stuart petition filed in this case proceeds upon the ground of an agreement that the property should be held subject to the claims of the policy holders of the Endowment Association and also upon the by-law before mentioned.

The Quarles petition proceeds upon the same ground as that of Mr. Edwards.

There is a separate suit filed by Stuart, not consolidated with the others, although I see no reason why it should not be, which is referred to, which is more comprehensive in its prayers than Quarles'. It charges this conveyance to have been absolutely void and as being a fraud against the creditors under the statute of Elizabeth; it prays that the deed may be set aside, as Mr. Fields understands it, subject to the return of $14,000; it reads, in fact, "subject to the return of *so much of the $14,000 as the court may deem equitable;*" then, again, he even made the stockholders parties, but he claims also that the property is liable, and that the court may decree the property to be applied to the payment of claims. The stockholders are also alleged to be liable to the extent of the money received by them, so that the claim is comprehensive enough to reach both the property and the stockholders; that case is not consolidated with the others at the present, and I cannot give any particular relief on those grounds.

My conclusion is that the deed from the Beneficial Endowment Association to the Commercial Alliance Life Insurance Company must be set aside and the proceeds applied to the satisfaction of the debts as far as they can go.

I see another question looming up which will be troublesome, but I have had enough of this case for the present term. I do not intend to decide any of the other questions at this time, but I refer the cause to the auditor of this court to state the accounts.

I have not found it necessary to pass upon the matters in controversy between the two associations, because, without reference to them, the creditors are entitled to the whole fund as against both companies.